2012 Ark. App. 311

Joshua CHASE, Appellant

v.

ARKANSAS DEPARTMENT OF HUMAN SERVICES, Minor Children, and David and Cheryl Collins, Appellees.

No. CA 11–1120.

Court of Appeals of Arkansas.

May 2, 2012.

Leah Lanford, Little Rock, for Appellant.

Tabitha B. McNulty, Little Rock, Keith L. Chrestman, Chrestman Group, PLLC, Jonesboro, for Appellees.

DAVID M. GLOVER, Judge.

In this dependency-neglect action commenced by the Arkansas Department of Human Services ("DHS"), Joshua Chase appeals the trial court's decision to award permanent custody of his two minor children, H.C. (dob 9–11–08) and K.C. (dob 9–15–09), to their maternal grandparents, appellees David and Cheryl Collins. Specifically, he argues that the award of permanent custody was in error because (1) the trial court failed to make the requisite finding that he, as the natural father of the children, was unfit for the purpose of overcoming the statutory preference for natural parents to have custody of their children, and (2) there was insufficient evidence to support that decision. We find merit in Joshua's second argument, and we reverse and remand this matter.

*The Pleadings/Adjudication Order (April 21, 2011)*

On February 1, 2011, DHS petitioned for emergency custody of the minor children.[1] At that time, the children's mother,

---

1. It is undisputed that Joshua notified DHS in December 2009 of his wife's drug usage in Arkansas.

Mildred Chase (the Collinses' daughter), was living in Redfield, Arkansas, with her parents, and Joshua, the children's father, was living in Ohio with his parents. Upon DHS's affidavit in support of emergency custody,[2] the trial court issued an order of emergency custody on February 1, 2011, finding that there was probable cause to believe that the children were dependent-neglected; that it was contrary to the welfare of the children to be returned to Mildred and Joshua based on allegations of drug use and instability; that removal from the custody of the Collinses and Mildred and Joshua was in the best interest of the children and was necessary to protect the health and safety of the children; and that DHS was the proper party to have custody of the children.

On February 14, 2011, Joshua filed for divorce from Mildred in Jefferson County Circuit Court. In the DHS action, a probable-cause order was filed on March 18, 2011, finding that it was in the children's best interest for temporary custody to be placed with the Collinses but granting Joshua unsupervised visitation and telephone visitation.[3] On March 29, 2011, the Collinses filed petitions for grandparent-visitation rights and for custody within the DHS action. In their petition for custody, they stated that Joshua and Mildred brought the children to Arkansas in February 2010 and returned to Ohio; that they returned to Arkansas in April 2010; and that Joshua returned to Ohio in May 2010, with Mildred remaining in Arkansas. They stated that they had raised the children since February 2010 and that it was in the children's best interest that they be granted permanent custody. The Collinses then filed a motion for support on April 20, 2011, asking that Joshua be required to pay support; they requested no support from Mildred. On that same day, the Collinses moved to intervene in the DHS case, and the order granting intervention was filed the next day.

On April 21, 2011, an adjudication order was filed in the DHS case. The children were adjudicated dependent-neglected, and the basis for that finding was against Mildred due to her drug usage. There was no finding of dependency-neglect on the basis of anything Joshua had done. The goal of the case continued to be reunification; placement with Joshua; or a permanent custodian, including placement with a relative. The order further required that Mildred cooperate with DHS and keep it informed of her residence and employment; and that both Mildred and Joshua refrain from illegal drugs and submit to random drug screens, obtain and

2. The affidavit stated that the trial court in this case ordered the children into foster care pursuant to a telephone call on January 26, 2011, at approximately 3:45 p.m.; that a petition had been filed on December 29, 2010, for the Collinses to receive temporary custody of the children because in December 2009 and early January 2010, the Division of Children and Family Services in Ohio initiated a child-maltreatment case against Joshua and Mildred based upon allegations that Joshua had attempted suicide; that in February 2010, Joshua and Mildred brought the children to Redfield, left them with the Collinses, and returned to Ohio, leaving the children in the custody of the Collinses; that Joshua and Mildred returned to Arkansas in April 2010;

that Joshua went back to Ohio in May 2010 while Mildred stayed in Arkansas; that the children had resided in the Collinses' home, and the Collinses had cared for them since February 2010; that Joshua had used methamphetamine in the past nine months and continued to use the drug; that Joshua admitted such use to Mildred; and that Mildred had used controlled substances, having tested positive for THC and methamphetamine.

3. In the probable-cause order, the trial court denied what appears to have been a private dependency/neglect petition filed by the Collinses pursuant to Ark.Code Ann. § 9–27–310(b)(3) (Repl.2009).

maintain stable housing and employment, maintain a clean, safe home, and demonstrate the ability to protect their children and keep them safe.

An Interstate Compact on the Placement of Children (ICPC) home study was performed on Joshua's parents' home in Ohio, where he was residing. The home study approved placement of the children in the home. The home study was performed in May 2011, and it included not only the condition of the home, but Joshua's financial condition, his employment situation, his medical history, his family background, and his legal history.

DHS filed a court report on June 30, 2011, noting that the home study was favorable for Joshua, but stating that a hair-follicle test taken on February 9, 2011, revealed that Joshua tested positive for marijuana and that, from DHS's perspective, Joshua has had a drug habit since 2006 and was still battling drug addiction. DHS recommended that custody be given to appellees and the case be closed.

### The Order (August 12, 2011)

A hearing was held on July 8, 2011, and on August 12, 2011, the trial court entered an order of permanent custody, support, and visitation.[4] In it, the trial court found that |₅Mildred was unfit for custody, and that, although preference in child-custody issues is usually given to the biological parents before grandparents, there was a question as to home stability with Joshua. The trial court then awarded permanent custody to the Collinses, finding that they had provided a good, loving, nurturing environment for the children and that they could provide a stable environment. The trial court awarded supervised visitation to

Mildred, but awarded liberal, unsupervised visitation to Joshua. It is from that order that Joshua takes this appeal.

### The Hearing (July 8, 2011)

At the July 8 hearing, DHS called Joshua, who acknowledged that he had previously used marijuana and had used methamphetamine on one occasion in July 2010 at Mildred's sister's apartment. He acknowledged that the February 9, 2011 hair-follicle test indicated that he tested positive for marijuana, but he stated that he did not use drugs anymore. Joshua testified that in Ohio he was employed by Mansfield Maintenance thirty-five to forty hours per week, performing custodial and maintenance work at $8.50 per hour; that he lived with his parents in a three-bedroom house; that he paid for rent, food, utilities, and gas for his vehicle; that he paid his bills on time; that he planned to live with his parents until this case was "completely done and over with"; and that he considered himself to be "pretty stable." He stated that he had another child; that he had joint custody of her; that he did not pay child support but paid for things that his daughter needed; and that he had her every other weekend. Joshua testified he does not have medical insurance and that it is not offered through his employment. He said that he had sent $300 to the Collinses for support, but he |₆admitted that from January to June 2011, he only sent $180. He informed the court that he and Mildred were technically still married but that they were separated and waiting for a divorce-hearing date.

Joshua explained that he and Mildred originally brought the children to Arkansas for a month in February 2010 because

---

4. Although the July 8, 2011 hearing of which the parties were given notice was designated as a review hearing, the parties were aware that the Collinses' petition for custody would also be heard at that time. In essence, due to the trial court's disposition of the case, this hearing was a permanency-planning hearing, although it was not styled as such.

he was having knee surgery in Ohio. Mildred came back to Arkansas around the first of April, so he packed the house in Ohio and moved to Arkansas as well. He said that he went back to Ohio in May to file an intent to relocate so that his other daughter would be able to relocate with him, then came back to Arkansas in June and stayed until July. He said Mildred and H.C. returned to Ohio for a two-week visit, but K.C. never returned to Ohio.

Joshua said that he had been living with his parents since July 2010 and that he became employed in August 2010. He said that since he began working, he sent over $3000 to support H.C. and K.C.— from July 2010 to December 2010, he sent $2700 [5] to Mildred, and he sent at least $300 to the Collinses.

Mildred testified that she had seen Joshua using controlled substances during their marriage; that a lot of the drug usage occurred in Ohio and when he was in the military; that he used drugs in the children's presence on a regular basis; that she did not believe that Joshua had gotten any help for his drug problem; and that Joshua took niacin to flush the THC out of his system. She also alleged that Joshua took Depakote from 2008 to 2010 for bipolar disorder.

Mildred refuted Joshua's reason for bringing the children to her parents-she said that Joshua's knee surgery only incapacitated him for about a week, that he could then use crutches, and that they brought the children to her parents because they were having marital issues. Mildred agreed that during the last half of 2010, Joshua sent her $2700, but she admitted that she used that money to continue her drug habit and pay for her sister's apartment. It was her opinion that it was

not in the best interest of the children for Joshua to be given custody, and she denied ever telling Joshua that it was; rather, she believed that it was in the children's best interest to remain in Arkansas with her parents. Mildred testified that she had been off methamphetamine for two and a half months, that she had smoked THC about two weeks ago, and that she would indicate positive for that drug if tested. She agreed she was not stable enough to raise her children at this time. She claimed that Joshua was not the primary caregiver of the children, and she said that she left when Joshua "raised his hands" to her.

Appellee Cheryl Collins testified that Mildred and Joshua had marital difficulties and that she had heard Joshua over the telephone yelling at Mildred with an "angry tone" in his voice, though she had not actually seen any domestic violence between the two. She said that Joshua had sent about $400 in the last several months, but that he had not sent any money to her in 2010. Cheryl testified that she and her husband were able to provide for the children financially, even though her husband was on disability. It was her opinion that it was in the best interest of the children for her and her husband to be jointly appointed permanent guardians. She confirmed that she did not make the initial contact with DHS; that Joshua made the first contact, alleging that the kids were in danger due to Mildred and that he was afraid for the children's lives.

LaSonya Goffin, a DHS employee, testified that it was DHS's recommendation that appellees be granted permanent custody. The basis for her recommendation was that the children had been in the

5. There was testimony that Joshua and Mildred had won a $10,000 lottery in Ohio in 2009.

home for a year, and she had "just seen so much trauma" when children were moved from one caretaker to another. Goffin said that when she read the home study, it appeared to her that Joshua was not stable, based on his history with drugs and his short employment. Goffin then admitted on cross-examination that she was not present at the adjudication hearing; that she held a staffing on the case without inviting Joshua or his attorney, though including the Collinses; and that she was unaware that the trial court only adjudicated the children dependent-neglected on the basis of Mildred's actions, not Joshua's. Even so, she testified that did not change her opinion that appellees should have permanent custody because it was traumatic for the children to be moved. Goffin was unaware that Joshua had passed all of his urine screens after he failed the first hair-follicle drug test; but even after that revelation, she was still of the opinion that Joshua had a drug problem. Goffin admitted that in a normal case (even with a parent with drug addiction), the goal would still be reunification. Goffin stated that she was under the impression that Joshua would "need to do some things" to get his children back. She acknowledged that the home study did not recommend any drug-abuse program for Joshua, but she stated her belief that Ohio officials did not know about the hair-follicle test. While she said that DHS strongly favors reunification with the natural parent, who is usually given an opportunity to "get their act together," Goffin testified that the home study, even though it approved placement, made her favor Joshua less. She was able to cite a laundry list of things offered to Cheryl Collins in the way of services, but she did not list any services provided to Joshua.

Upon further questioning by the trial court, Goffin testified that Joshua's instability was unsatisfactory in recommending him for custody. She said that he did not "appear" to be stable. In support of that statement, she cited his job history, drug use, and the fact that he lived with his parents. It was her "feeling" that if he was staying with his parents and was still using drugs, his parents would be the primary caregivers of the children. In arriving at her decision, Goffin admitted that she never had an opportunity to meet with Joshua, yet concluded that he was not stable, used drugs, had been working only since September 2011, was sleeping on his parents' couch, and had a criminal background, although she had no idea of what he had been convicted. She concluded that Joshua needed to maintain employment for more than a couple of weeks, have his own home, remain drug free, and participate in a drug-rehabilitation program.

Appellee David Collins testified that Joshua and Mildred had marital problems; that he had heard Joshua over the telephone while he was talking to Mildred; and that he could tell that Joshua was angry by the "loud talking" directed at Mildred. It was David's opinion that it was in the children's best interest for permanent custody to be given to him and his wife. David explained that he was disabled due to a neck injury and took hydrocodone on a regular basis for his injury, but he then said that he did not take it unless absolutely necessary. David said that Joshua had not left him $3000 to take care of the children at any time; however, he said that he knew Joshua had sent Mildred money, but had never asked Mildred for any money to help support the kids. David admitted that he had not seen Joshua using any controlled substances. Appellees rested after David's testimony.

DaMarcus Scruggs testified that he lived with Joshua and Mildred for eight or nine months, that Joshua was the primary

caregiver for the children, and that of the two, Joshua was the responsible one. He denied ever seeing Joshua be physically violent toward Mildred, although he admitted that they had verbally argued. He also said that he had never seen Joshua use drugs around the children, and that it would be a shock to him that Joshua used drugs on a regular basis.

Joshua then testified again, on his own behalf. He reiterated that he and Mildred dropped the children off in Arkansas in February 2010 so that he could have his knee surgery, as he would not be able to recuperate and take care of the children as well. He said that at the end of March or beginning of April, Mildred told him she was leaving and going to Arkansas; that they made plans for him to move as well; and that he stayed at the Collinses' house when he arrived in Arkansas. He said he returned to Ohio in May and came back to Arkansas in June, stayed until July, and then returned to Ohio because he did not have anywhere else to go after the Redfield Police Department told him that he would be arrested for criminal trespass if he came onto the Collinses' property. Joshua said that his next trip to Arkansas was not until December because he was working and sending all but $20 per paycheck to Mildred. He said he later learned that she was not using the money for the children but rather for her drug habit. Joshua testified that the only time he used methamphetamine, he was with Mildred. He said that he had not used methamphetamine since July 2010, but that he had smoked marijuana in December 2010, which was why he failed the February 2011 hair-follicle test. Joshua stated that he had taken drug tests at every court hearing except the last one and that all of the tests were negative, including the one he took at the July 8

hearing. Joshua denied that he used niacin to mask marijuana. Joshua also presented receipts for the money he sent Mildred from July to December 2010, which he stopped sending after learning that Mildred was not using the money for the children. Joshua testified that he had some minor criminal infractions, but that he had to have a background check performed to work at some locations and had passed. He asserted that he was perfectly capable of taking care of his kids and that he was stable.

Marsha Chase, Joshua's mother, testified that he was currently living with her; that a home study was performed on her home and that the home passed; that Joshua took an active role in parenting his children; and that she had never seen him do drugs around his children. She said that Joshua had been employed for a year as of the first part of September; that he was stable; that he got up and went to work every day; and that he knew his responsibilities and was willing to do what it took to meet them.

### The Trial Court's Findings
#### (July 8, 2011)

The trial court, from the bench, found that Mildred was not a fit parent to have custody of the children. As for Joshua, the trial court stated that it was its practice and procedure and the law to give due consideration to the natural parent. The trial court stated that had the case been in February, it would have granted custody to Joshua, but the trial court received the report from Ohio and while it came back favorably, the trial court was concerned with the positive hair-follicle test that came back in February. The trial court found that the use of controlled substances rendered a parent unfit "as it relates to it"

and that the use was in December.[6]

The trial court found that Joshua provided support to Mildred who, by her own testimony, used the money to do as she pleased and did not provide it to her parents for the children. The trial court found that stability was a factor and that in the last fifteen months, Joshua was not as stable as the court would have liked him to be. The court found the Collinses to be of suitable age and stable. The trial court granted Joshua liberal visitation and awarded permanent custody to Cheryl and David Collins.

### Discussion

■ |₁₃Juvenile proceedings are equitable in nature; therefore, our standard of review on appeal is de novo. *Rose v. Arkansas Dep't of Human Servs.*, 2010 Ark. App. 668, 2010 WL 3902858. However, the circuit court's findings of fact are not reversed unless they are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Id.*

■ We find merit in Joshua's second argument, that there was insufficient evidence presented to justify an award of permanent custody to the Collinses. Specifically, in support of this argument, Joshua's attorney argued at the close of the case that DHS did not make reasonable efforts with regard to Joshua; that there was no adjudication of dependency-neglect against Joshua; that Joshua's home study was approved; that DHS held a staffing without either Joshua or his attorney present; that Joshua had done everything he

was supposed to do; that even if he had been the reason the children were adjudicated dependent-neglected (which he was not), parents are offered services and a chance to show improvement; that parents who improve are almost without exception reunited with their children; that the DHS caseworker did not even know that dependency-neglect was not adjudicated against Joshua; and that Joshua had passed all of his drug screens after he failed the hair-follicle test.

■ The Arkansas Juvenile Code is to be liberally construed in order for its purposes to be carried out. Ark.Code Ann. § 9–27–302 (Repl.2009). These purposes include assuring that "all juveniles brought to the attention of the courts receive the guidance, care, and control,|₁₄*preferably in each juvenile's own home* when the juvenile's health and safety are not at risk, that will best serve the emotional, mental, and physical welfare of the juvenile. . . ." and "to preserve and strengthen the juvenile's family ties when it is in the best interest of the juvenile." *Id.* § 9–27–302(1), (2)(A) (emphasis added).

Arkansas Code Annotated section 9–27–338 (Supp.2011) addresses permanency-planning hearings. Although the July 8 hearing was not called a permanency-planning hearing, it was in effect such a hearing because it determined the permanent placement of the children. Subsection (c) of this statute provides that at the permanency-planning hearing, the trial court shall enter one of the following permanency-planning goals, which are listed by preference. The first preference returns the juvenile to the parent, guardian, or custodian at the permanency-planning hearing if it is in the best interest of the juvenile and the juvenile's health and safety can be

---

6. This finding, while made from the bench, was not incorporated into the order awarding

permanent custody to the Collinses.

adequately safeguarded if returned home. The fifth preference authorizes a plan to obtain a permanent custodian, including permanent custody with a fit and willing relative. In *Mahone v. Arkansas Dep't of Human Servs.*, 2011 Ark. 370, 383 S.W.3d 854, our supreme court held that the first preference applies to both custodial and noncustodial parents—otherwise, the noncustodial parent would fall to the fifth preference. Therefore, Joshua falls into the first category; the Collinses fall into the fifth category.

While the trial court noted the preference for returning children to their parent, the evidence presented at the hearing undercuts that this preference was truly considered. To begin with, the DHS case was opened in February 2011, and the trial court placed permanent custody with the Collinses in August 2011—a mere six months later. Though this time frame may be sufficient in some cases, we hold that it was not in this case. It is a fact that Joshua's hair-follicle test, taken at the outset of DHS's involvement in this case, was positive for marijuana; however, there seems to be a failure to take into account that all of Joshua's subsequent drug tests were negative. While both DHS and the trial court refer to Joshua's drug addiction, the trial court never ordered a drug-and-alcohol assessment or required Joshua to be involved in any type of drug treatment.

Testimony from LaSonya Goffin, the DHS employee, was also inadequate in this case. First, her basis for recommending that the children be permanently placed with the Collinses was that she had "just seen so much trauma" when children were moved from one caretaker to the other. Next, even though Joshua's parents' home, where he was currently living, was approved to place the children after an ICPC home study, Goffin testified, without any basis, that after reading the home study, it "made her favor Joshua less." Finally, she was of the opinion that Joshua was not stable because he had a drug problem; had a short employment history; and was living with his parents, who she believed would be the children's primary caregivers if Joshua were given custody. But even though Goffin believed Joshua had a drug problem, he was offered no services other than drug testing prior to court hearings. With regard to his employment, Joshua became employed within one month after he returned to Ohio permanently, where he was still employed almost one year later. Without any basis for her belief, Goffin was of the opinion that Joshua's parents would be the primary caregivers for the children if custody was awarded to him; however, the other set of grandparents were already caring for the children. Even if Joshua's parents became caregivers on a regular basis, of which there was no testimony to support this presumption, the fact remains that the children would also be in the care of their natural father. Additionally, Joshua is already co-parenting another child in Ohio.

Goffin admitted that, in a normal case, the goal for a parent with drug addiction would still be reunification, and that DHS strongly favors reunification with the natural parent, who is usually given the opportunity to "get their act together"; but it is apparent that DHS failed Joshua by not offering services. Goffin, who was not present at the adjudication hearing, was unaware that the dependency-neglect adjudication was based on Mildred's actions, not Joshua's actions. Goffin also admitted that she held a staffing on the case with the Collinses in attendance without inviting Joshua or his attorney. In fact, Goffin admitted that she had never met Joshua. In light of the above reservations, the trial court then awarded Joshua liberal unsupervised visitation for extended periods of time.

We recognize that Joshua has some issues to resolve; however, since this case was commenced by DHS, a mere six months before the trial court awarded the Collinses permanent custody, he had no positive drug tests, maintained employment, and was living in an approved housing situation with his parents. All of this was accomplished with minimal assistance from DHS.

We hold that the grant of permanent custody to the Collinses was clearly erroneous. Under the liberal construction of our juvenile code, all of Joshua's accomplishments since DHS's involvement demonstrate that the children's health and safety would not be at risk if they were placed in Joshua's custody and would preserve and strengthen the family ties. However, we also acknowledge that several months have now passed since the trial court's award of permanent custody to the Collinses, and that we are not privy to anything that may have occurred during this interim time. Certainly, we recognize the Collinses' continued love of, care for, and devotion to their grandchildren, who have lived in the Collinses' home under their supervision for over three years. However, we hold that the trial court was premature in awarding permanent custody to the Collinses. We reverse and remand for the trial court to reinstate temporary custody while DHS provides the normal array of services to Joshua in order to determine if he can be a proper and adequate parent. Due to our disposition on this point, it is unnecessary to address Joshua's fitness argument.

Reversed and remanded for further proceedings consistent with this opinion.

HART and GRUBER, JJ., agree.